UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-vs-

ROBERT FORBES, JR. a/k/a RA RA
a/k/a HENNY,

REPORT AND RECOMMENDATION
20-CR-6140-FPG-MJP

Defendant.

## APPEARANCES

For the United States:

Robert Marangola
Assistant U.S. Attorney
U.S. Attorney's Office
100 State Street
Rochester, NY 14614
585-263-6760

For the Defendant:

Peter J. Pullano, Esq.
Tully Rinckey, PLLC
400 Linden Oaks
Suite 110
Rochester, NY 14625
585-492-4700

## REPORT AND RECOMMENDATION

**Pedersen, M.J.** In a superseding indictment filed on August 12, 2021 ("Indictment"), the Grand Jury charged defendant Robert Forbes, Jr., a/k/a Ra Ra a/k/a Henny, with nine crimes including: two counts of Hobbs Act Conspiracy (Counts 1 & 8); one count of Hobbs Act robbery (Count 2); 4 counts of Use of a Firearm During and in Relation to a Crime of Violence (Counts 3, 5, 7, & 9); and two counts of Attempted Hobbs Act Robbery (Counts 4 & 6). (ECF No. 68.)

On October 25, 2020, Defendant filed an omnibus discovery motion, with attached Exhibits A through G. (Not. of Mot., ECF No. 94.) The government submitted a response to Defendant's motion on November 19, 2021. (Gov't's Resp., ECF No. 101.) Defendant thereafter filed a supplemental motion on February 17, 2022, which attached as Exhibit H Defendant's standing affidavit. (Not. of Mot., ECF No. 120.) The government filed its response to the supplemental motion on March 2, 2022. (Gov't's Mem. of Law, ECF No. 121.) The undersigned heard oral argument on March 10, 2022, and issued a decision on all the issues raised in Defendant's motion, except for reserving on those aspects of Defendant's motion seeking (1) dismissal of the Indictment on various grounds; (2) suppression of identification; (3) suppression of tangible evidence; and (4) suppression of statements. (*Id.* at 127.)

At the March 10, 2022, oral argument, the undersigned provided Defendant with two weeks to submit the photo arrays that he contends were suggestive, together with a memorandum describing how the photo arrays were suggestive, in support of his motion to suppress identification testimony. (ECF No. 124.) In addition, in connection with that aspect of Defendant's motion seeking to suppress statements, the undersigned provided Defendant with two weeks to submit an affidavit from someone with personal knowledge regarding the statement(s) Defendant seeks to suppress, together with a supporting memorandum of law. (*Id.*) Defendant submitted his second supplemental motion addressing these issues on April 21, 2022 (ECF No. 128), including an affidavit from Defendant, sworn to on March 30, 2022, in support of his motion to suppress statements (Def.'s Aff., ECF No. 128-1), and the challenged photo array (ECF No. 128-2). The government filed its response to Defendant's second

supplemental motion to suppress statements and identifications on April 28, 2022, which included a compact disc containing Defendant's April 2020 interview in connection with which Defendant seeks to suppress his post-arrest statements. (ECF No. 129.) The undersigned held a hearing on May 3, 2022, regarding the existence of probable cause for law enforcement to conduct the March 26, 2020, traffic stop. (*Id.*) Finally, on May 6, 2022, the government submitted its response on the limited issue of Defendant's arguments made during the May 3, 2022, evidentiary hearing related to the photo array. (ECF No. 132.)

After hearing oral argument, reviewing all the motion papers, conducting a hearing regarding the March 26, 2020, traffic stop, and conducting an *in camera* review of Defendant's April 2020 interview, the undersigned recommends that the District Court deny those aspects of Defendant's motion seeking to (1) dismiss the Indictment on various grounds; (2) suppress physical evidence seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander; (3) suppress physical evidence seized from a Kia Sportage; (4) suppress Defendant's statements; (5) suppress identification testimony; (6) challenge the existence of probable cause for the March 26, 2020, traffic stop of Defendant's Mitsubishi Mirage; (7) challenge the existence of probable cause to conduct the warrantless search of the Mitsubishi Mirage on March 26, 2020; (8) challenge the existence of probable cause for the issuance of the April 1, 2020, search warrant for Defendants Motorola E6 cellular phone and suppression of any evidence resulting from a search of the contents of that phone; and (9) challenge the existence of probable cause for the issuance of the April 21, 2020, search warrant for

Defendant's 2019 Mitsubishi Mirage after it was impounded and suppression of evidence resulting from that search.

## STANDARD OF LAW

The Honorable Frank P. Geraci, Jr. referred this matter to the undersigned as follows: "[a]ll pre-trial matters in this case are referred to the above-named United States Magistrate Judge, including all pre-trial matters that a Magistrate Judge may hear and determine pursuant to 28 U.S.C. Section 636(b)(1)(A), and those which a Magistrate Judge may hear and thereafter file a report and recommendation for disposition pursuant to Section 636(b)(1)(B). All procedural aspects of matters properly before the Magistrate Judge under this Order, including scheduling and the filing of briefs or other supporting material, shall be determined by the Magistrate Judge. All motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge." (Text Order of Referral, ECF No. 23.)

## DISCUSSION

***Findings of Fact Regarding Defendant's Motion to Dismiss Counts 4 and 6 of the Indictment for Insufficiency.[1]***

It appears that Defendant seeks to dismiss Counts 4 and 6,[2] both charging Defendant with "Attempted Hobbs Act Robbery," for failing to include "the factual

---

[1] Defendant moves to dismiss the Indictment on several different grounds. However, the undersigned found it somewhat difficult to decipher on which grounds Defendant seeks to dismiss which counts of the Indictment. The undersigned has endeavored to ensure that all grounds for dismissal are addressed herein.

[2] The heading in Defendant's papers seeking this relief reads "Motion for Dismissal of Counts 1, 2 and 3 of the Indictment." (Affidavit of Peter J. Pullano at 24, Oct. 25, 2021 ("Pullano Aff."), ECF No. 94 (the page number refers to the one automatically assigned when the document was electronically filed, and which can be found in the upper right-hand corner of the document.)) Defense counsel indicated at oral argument that the heading is incorrect.

allegations of the elements of the offense." (Pullano Aff. ¶ 100.) Defendant contends

that the Indictment "does no more than recite types of crimes, without any specific

facts describing alleged criminal acts." (*Id.* ¶ 103.)

> Count 4 of the Indictment provides:
>
> On or about March 22, 2020, in the Western District of New York, the defendants, ROBERT FORBES, JR. a/k/a Ra Ra a/k/a Henny, and RAEKWON GREEN a/k/a Bundy a/k/a Bundles, did unlawfully attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in particular, the attempted robbery of controlled substances and United States currency derived from the sale of controlled substances belonging to a person engaged in the unlawful possession and distribution of controlled substances, from, and in the presence of, Victim B and Victim C, persons known to the Grand Jury. All in violation of Title 18, United States Code, Sections 1951(a) and 2.

(Indictment at 3, ECF No. 68.)

> Count 6 of the Indictment provides:
>
> On or about March 25, 2020, in the Western District of New York, the defendant, ROBERT FORBES, JR. a/k/a Ra Ra a/k/a Henny, did unlawfully attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in particular, the attempted robbery of controlled substances and United States currency belonging to a person believed by the defendant to be engaged in the unlawful possession and distribution of controlled substances, from, and in the presence of, Victim D, a person known to the Grand Jury. All in violation of Title 18, United States Code, Sections 1951(a) and 2.

(*Id.* at 4.)

***Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 4 and 6 the Indictment for Insufficiency.***

Federal Rule of Criminal Procedure 7(c)(1) requires, among other things, that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . " *Id.* There are two constitutional requirements for an indictment to be sufficient: (1) it must contain "'the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend,'" and (2) it must enable the defendant "'to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87 (1974)). "Nevertheless, 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992), *cert. denied*, 504 U.S. 926 (1992)). "Generally, the indictment does not have to specify evidence or details of how the offense was committed. Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case." *United States v. Walters*, 963 F. Supp. 2d 125, 130 (E.D.N.Y. 2013) (citations omitted); *see also United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) ("[T]here is a difference between what the Government must prove at trial and what it must plead in the indictment.").

In view of the forgoing principles, the undersigned believes that Defendant's allegations regarding the insufficiency of Counts 4 and 6 are unpersuasive. The language of Counts 4 and 6 sufficiently track that of 18 U.S.C. § 1951(a), as charged

in the Indictment. Moreover, Counts 4 and 6 go beyond the language of statute, providing factual allegations, including but not limited to, the dates of the attempted Hobbs Act robberies and the targets of the attempted robberies—controlled substances and United States currency derived from the sale of controlled substances. (Indictment at 3, 4, ECF No. 68.) In addition, the Indictment states the place of the attempted robberies, the Western District of New York. (*Id.*) For these reasons, the undersigned believes Counts 4 and 6 meet the basic requirements for a Hobbs Act indictment and recommends that the District Court deny this aspect of Defendant's motion.

### Findings of Fact Regarding Defendant's Motion to Dismiss Counts 2, 4, 6, and 8 for Failure to Allege Mens Rea.

Defendant seeks to dismiss Counts 2, 4, 6, and 8, which consist of two counts of "Hobbs Act Robbery" and two counts of "Attempted Hobbs Act Robbery," for failure to allege *mens rea*. (Pullano Aff. ¶¶ 95–103, ECF No. 94.) Defendant contends that since these counts "lack necessary allegations of criminal intent . . . [they] do not properly allege an offense against the United States." (*Id.* ¶ 105, internal quotation marks and citations omitted.) Defendant asserts that use of the word "unlawfully" is not sufficient to satisfy the element of *mens rea*. (*Id.* ¶ 106.)

The government contends that Defendant's motion should be dismissed because other cases in the Second Circuit and the Western District of New York have found the charging language in Counts 2, 4, 6, and 8 to be legally sufficient. (Gov't's Resp. at 12.) Specifically, with respect to Defendant's argument regarding the failure to allege *mens rea*, the government asserts that all four counts properly allege this element as they include the language "obstruct" and/or "attempt to obstruct"

7

commerce "by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1)." (*Id.* at 12.) The government argues that since "robbery" implies "knowing" and "willful" conduct, the *mens rea* element is satisfied. (*Id.*)

### Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 2, 4, 6, and 8 for Failure to Allege Mens Rea.

Courts in this Circuit have held that the statutory definition of "robbery" in 18 U.S.C. § 1951(b)(1) implies "knowing" and "willful" conduct, and an indictment is sufficient even if it does not explicitly reference those terms. *United States v. Jackson*, 513 F. App'x 51, 55 (2d Cir. 2013), *cert. denied*, 569 U.S. 939 (2013) (summary order) (holding that "[a]lthough the indictment did not specifically contain the words 'knowingly' or 'willfully,' the plain and common-sense reading of the indictment put the defendant on notice of what the charges against him were, such that he was not prejudiced in the preparation of his defense."); *United States v. Tobias*, 33 F. App'x 547, 549 (2d Cir. 2002), *cert. denied*, 538 U.S. 933 (2003) ("The indictment tracked the language of 18 U.S.C. § 1951, using the term 'robbery,' which necessarily implies knowing and willful conduct."); *United States v. McGee*, No. 15-CR-6079 (JWF), 2017 WL 667199, at *2 (W.D.N.Y. Feb. 17, 2017), *report and recommendation adopted*, No. 15-CR-6079-FPG, 2017 WL 2880121 (W.D.N.Y. July 6, 2017) (holding that an indictment was "sufficient to assert the *mens rea* element of robbery even though it does not contain the words 'knowingly' or 'willfully.'"); *United States v. McCoy*, 14-CR-6181 EAW, 2016 WL 6952351, at *3-5 (W.D.N.Y. Nov. 28, 2016) ("[T]he grand jury in this case plainly determined that there was probable cause to believe that Defendants committed a Hobbs Act robbery . . . . Under settled Second Circuit

precedent, this is plainly sufficient to allege the *mens rea* element of 'knowingly' and 'willfully' for a Hobbs Act violation").

The undersigned believes that the Indictment is sufficient to assert the *mens rea* element of robbery even though it does not contain the words "knowingly" or "willfully." The Indictment specifically references "robbery" and its statutory definition, and thereby imputes the necessary *mens rea* therein.[3] Therefore, Counts 2, 4, 6, and 8 not only track the language of 18 U.S.C. § 1951(b)(1) but also include the requisite *mens rea* requirement. For these reasons, the undersigned recommends that the District Court deny this part of Defendant's motion.

### Findings of Fact Regarding Defendant's Motion to Dismiss Counts 2 through 9 for Lack of a Nexus to Interstate Commerce and Failing to Allege Facts to Support a Claim of Aiding and Abetting.

Defendant seeks dismissal of Counts 2 through 9 of the Indictment on the grounds that they "do not make any specific allegations as to what was actually attempted, nor do they allege how the defendants [sic] attempted to interfere with interstate commerce." (*Id.* ¶ 112.)

Similarly, Defendant seeks dismissal of all counts in the Indictment on the basis that the robberies did not affect interstate commerce because "the taking of small sums of money from an individual has its primary and direct impact only on

---

[3] "The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

that individual and not the national economy" (*Id.* ¶ 27⁴ at 38) and that "[c]ourts have been hesitant to find the requisite interstate commerce nexus in cases involving robberies of individuals that have some connection with interstate commerce, and especially involving robberies of individuals in their homes." (*Id.* ¶ 30 at 39.) Defendant contends that the Indictment's reliance on the notion that the robberies were to obtain drug proceeds is the government's attempt to bring the robberies under the purview of the Hobbs Act. (*Id.* ¶ 35, p. 43.)

In response, the government argues that courts have found the language included in the Indictment to be legally sufficient to allege an effect on interstate commerce because it states that Defendant knowingly stole or attempted to steal drugs or drug proceeds and the market for illegal drugs falls under federal jurisdiction. (Gov't's Resp. at 13, ECF No. 101.) In particular, the government argued that

> Count 2 alleges that the defendant obstructed commerce by "the robbery of controlled substances and United States currency derived from the sale of controlled substances." (Document No. 68, at p. 2). Count 4 alleges that the defendant attempted to obstruct commerce by "the attempted robbery of controlled substances and United States currency derived from the sale of controlled substances." (*Id.* at pp. 3 [sic]). Count 6 alleges that the defendant attempted to obstruct commerce by "the attempted robbery of controlled substances and United States currency belonging to a person believed by the defendant to be engaged in the unlawful possession and distribution of controlled substances." (*Id.* at p. 4). Count 8 alleges that the defendant obstructed commerce by the robbery "of United States currency derived from the sale of controlled substances." (*Id.* at p. 5).

---

⁴ Defense counsel's affidavit reaches paragraph 128 on page 35, but the next paragraph is numbered 23. The paragraphs continue to be misnumbered up to paragraph 37 until page 43 of the affidavit, where defense counsel picks back up with paragraph 129. To quell any confusion, when referring to any of the misnumbered paragraphs the undersigned will also refer to the page number of the affidavit.

(*Id.* at 12–13.)

With respect to Counts 2 through 9, Defendant also contends that "there are no allegations as to how the defendant is alleged to have 'aided and abetted' in any of those counts." (Pullano Aff. ¶ 121.) Instead, Defendant asserts that the Indictment only includes the statutory citation to 18 U.S.C. § 2 and does not allege facts that would support a charge of aiding and abetting. (*Id.* ¶ 122.)

The government maintains that including the citation to 18 U.S.C. § 2 in Counts 2 through 9 put Defendant on notice that "the government intends to rely, at least in part, on an aiding and abetting theory at trial." (Gov't Resp. at 13.) The government further asserts that even if the Indictment did not include a charge of aiding and abetting, a trial court could instruct the jury on such a charge at trial. (*Id.*)

### Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 2 through 9 for Lack of a Nexus to Interstate Commerce and Failing to Allege Facts to Support a Claim of Aiding and Abetting.

"The Hobbs Act prohibits robberies that affect interstate commerce 'in any way or degree,' 18 U.S.C. § 1951(a); so the required showing of an effect on interstate commerce is *de minimis*." *United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007), *cert. denied*, 552 U.S. 1220 (2008).

Defendant seeks dismissal of Counts 2 through 9 contending that the Indictment does not provide allegations as to what was attempted or how Defendant attempted to interfere with interstate commerce. He also seeks dismissal of all counts asserting that the alleged robberies on which the Indictment is premised did not affect interstate commerce. However, at this point in the litigation, Defendant's

arguments do not align with established Second Circuit and Supreme Court precedent.

As a general matter, it is well settled that Congress has the power to control purely local drug distribution activities because such local activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). In *Taylor v. United States*, 579 U.S. 301 (2016), the Supreme Court addressed the contours of the interstate commerce requirement found in the Hobbs Act. The plaintiff in *Taylor* was charged with two home invasions of drug dealers, seeking to rob them of drugs and drug proceeds. *Id.* at 305. The plaintiff argued that the government failed to satisfy the interstate commerce element of the Hobbs Act because it had not proven that the drugs subject to the robbery "originated or were destined for sale out of State," or that the victim drug dealers "operated an interstate business." *Id.* at 307. Relying on its 2005 holding in *Raich*, the Supreme Court rejected the plaintiff's Commerce Clause arguments. The Court explained that its holding was simply a logical extension of *Raich*:

> The case now before us requires no more than that we graft our holding in *Raich* onto the commerce element of the Hobbs Act. The Hobbs Act criminalizes robberies affecting 'commerce over which the United States has jurisdiction.' § 1951(b)(3). Under *Raich*, the market for marijuana, including its intrastate aspects, is 'commerce over which the United States has jurisdiction.' It therefore follows as a simple matter of logic that a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction.

*Id.*

Thus, when a robber tries to steal drugs or drug proceeds from a drug dealer, "proof of such an attempt in itself supports the conclusion that the robber attempted

to affect interstate commerce, and the robber is therefore convictable under the Hobbs Act." *United States v. Lee*, 834 F.3d 145, 152 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1599 (2017).

The forgoing is not to say that Defendant's arguments here are irrelevant, but they are premature. The Court in *Taylor* explained that its holding "does not make the commerce provision of the Hobbs Act superfluous." *Taylor*, 579 U.S. at 308–09. Indeed, there may be Hobbs Act trials where the conduct proven, "even in the aggregate, may not substantially affect commerce." *Id.* at 309. But the Court also made clear that the nature of the proof needed to satisfy the commerce element focuses not on the specific interstate actions of the defendant, but on the nature of the defendant's activities. "[W]here the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect." *Id.* In alleging that Defendant targeted drug proceeds and controlled substances, the undersigned believes that the Indictment sufficiently alleges a nexus to interstate commerce.

Moreover, with respect to Defendant's assertion that Counts 2 through 9 fail to sufficiently allege what Defendant attempted and how it was attempted such that his actions could have an impact on interstate commerce, the undersigned believes that the citation to 18 U.S.C. § 2 in each of those counts put Defendant on notice that aiding and abetting was a theory that the government might pursue. *United States v. Weintraub*, 27 F. App'x 54, 56 (2d Cir. 2001) ("[The defendant] could not have been surprised by the government's reliance on the aiding-and-abetting theory because the

indictment cited the aiding-and-abetting statute . . . 18 U.S.C. § 2.") Moreover, as the government correctly argued, "it is well established that a trial judge may properly give an aiding and abetting instruction even if the indictment does not expressly charge a violation of 18 U.S.C. § 2." *United States v. Eisner*, 59 F. App'x 379, 382 (2d Cir. 2003), citing *United States v. Mucciante*, 21 F.3d 1228, 1234 (2d Cir. 1994) (internal citations omitted).

Furthermore, Defendant's argument that Counts 2 through 9 fail to allege "what was actually attempted [ ] or how the defendants attempted to interfere with interstate commerce" is not persuasive. Counts 2, 4, 6, and 8 refer to robberies/attempted robberies that occurred on certain dates and geographical locations and provide the particulars of what Defendant is alleged to have done on the referenced dates. For example, Count 2 provides, in relevant part, that "[o]n or about February 18, 2020 . . . [Defendant] . . . did unlawfully obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce . . . and the movement of articles and commodities in commerce, by robbery . . . in particular, the robbery of controlled substances and United States currency derived from the sale of controlled substances." (Indictment at 2, ECF No. 68.)

Moreover, Counts 3, 5, 7, and 9 also refer to the specific dates on which the robberies/attempted robberies occurred and that Defendant allegedly "did knowingly and unlawfully use, carry and brandish, and in furtherance of such crime, did

knowingly and unlawfully possess and brandish, a firearm."[5] (Indictment at 2–3.) Accordingly, the undersigned believes that Defendant's argument that Counts 2 through 9 fail to allege "what was actually attempted [ ] or how the defendants attempted to interfere with interstate commerce" is meritless. Based upon the forgoing, the undersigned recommends that the District Court deny this aspect of Defendant's motion.

### Findings of Fact Regarding Defendant's Motion to Dismiss Counts 3, 5, 7, and 9 Regarding 18 U.S.C. § 924(c) Issues.

Defendant seeks to dismiss Counts 3, 5, 7, and 9, charging Defendant with "Use of a Firearm During and in Relation to a Crime of Violence," and which allege violations of 18 U.S.C. § 924(c)(1)(A)(ii) and 2. (Pullano Aff. ¶ 123). Defendant contends that "the government [must] prove beyond a reasonable doubt all of the elements of Section 924(c), one of which is that the defendant committed the underlying crime." (*Id*.) Defendant argues that if his challenge regarding the sufficiency of Count 2 (Hobbs Act Robbery) of the Indictment is successful, then it follows that Counts 3, 5, 7, and 9 must be dismissed. (*Id*.) He also, somewhat repetitively, contends that Counts 3, 5, 7, and 9 are "defective by default in that the offenses alleged within the Indictment set forth in counts [*sic*] 2, 4, 6, and 8 are not violations of the *Hobbs Acts* [*sic*] under Title 18 U.S.C. § 1951(a)." (*Id.* ¶ 37.) Defendant further argues that Counts 3, 5, 7, and 9 should be dismissed because the allegations of "aiding and abetting," and "attempting" a Hobbs Act robbery do not

---

[5] Counts 3, 7, and 9 contain the quoted language verbatim as they are charged only against Defendant. Count 5 is charged against Defendant and his co-defendant so the last word in the quote—"firearm"—is plural.

qualify as "crimes of violence" under 18 U.S.C. § 924(c). (*Id.* ¶¶ 124–26.) Finally, Defendant contends that Counts 3, 5, 7, and 9 should be dismissed under the holding of a case referred to and cited by Defendant only as "*Davis*," which held that 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague.[6] (*Id.* ¶ 126.) Defendant does not elaborate further on this argument.

The government rejects Defendant's argument that the Second Circuit has held that attempted Hobbs Act robbery and aiding and abetting an attempted Hobbs Act robbery do not constitute crimes of violence under 18 U.S.C. § 924(c)(3)(A). (Gov't Resp. at 14.) The government also rejects Defendant's argument that the holding of *Davis* requires that Counts 3, 5, 7, and 9 be dismissed pursuant to 18 U.S.C. § 924(c)(3)(B) as unconstitutionally vague. (*Id.*) The government contends that the predicates for those counts—*i.e.*, Counts 2, 4, 6, and 8—constitute crimes of violence under 18 U.S.C. § 924(c)(3)(A). (*Id.*)

### Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 3, 5, 7, and 9 Regarding 18 U.S.C. § 924(c) Issues.

Defendant alleges that Counts 3, 5, 7, and 9, charging Defendant with "Use of a Firearm During and in Relation to a Crime of Violence," must be dismissed because "attempting" and "aiding and abetting" Hobbs Act robbery and attempted Hobbs Act robbery do not constitute "crimes of violence" under 18 U.S.C. § 924(c).

---

[6] The government clarified that Defendant appeared to be relying on *United States v. Davis*, – U.S. –, 139 S. Ct. 2319 (2019) (Referring to 18 U.S.C. § 924(c)(3)(B), the majority held: "Even the government admits that this language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague." *Davis*, 139 S. Ct. at 2324.

However, in opposition, the government cites to the case of *United States v. McCoy*, in which the Second Circuit clearly provides that "we hold that Hobbs Act attempted robbery qualifies as a crime of violence under § 924(c) because an attempt to commit Hobbs Act robbery using force necessarily involves the 'attempted use . . . of force' under § 924(c)(3)(A)." 995 F.3d 32, 57 (2d Cir. 2021). In that same case, the Second Circuit also disposed of Defendant's argument that "aiding and abetting" Hobbs Act robbery does not constitute a crime of violence, holding that:

> There is no culpable aiding and abetting without an underlying crime committed by some other person; and aiding and abetting itself is not the predicate crime for firearm brandishing under § 924(c). The aiding-and-abetting concept describes the role of the defendant that makes him liable for the underlying offense. [W]hen a person is charged with aiding and abetting the commission of a substantive offense, the 'crime charged' is . . . the substantive offense itself  .  .  . The crime charged in a prosecution for aiding and abetting a Hobbs Act robbery is thus Hobbs Act robbery  .  .  . If the underlying offense is a crime of violence, it is a predicate for § 924(c) liability; if the defendant aided and abetted that underlying offense, he is guilty of the underlying offense  .  .  . Hobbs Act robbery and Hobbs Act attempted robbery are crimes of violence within the meaning of § 924(c).

*Id.* at 58 (internal quotation marks and citations omitted).

With respect to Defendant's motion seeking to dismiss Counts 3, 5, 7, and 9 as unconstitutionally vague under 18 U.S.C. § 924(c)(3)(B), other than citing to a partial case name, Defendant does not provide any factual or legal support for this claim. The *Davis* case relied on by Defendant held that the language of § 924(c)(3)(B), in defining crime of violence in terms of a "risk" that physical force would be used, was unconstitutionally vague. 139 S. Ct. at 2336.

However, the undersigned believes that the government adequately opposed this part of Defendant's motion by reiterating that the predicates for Counts 3, 5, 7,

and 9 (*i.e.*, Counts 2, 4, 6, and 8) charging crimes of Hobbs Act robbery, attempted Hobbs Act robbery, and aiding and abetting Hobbs Act robbery/attempted Hobbs Act robbery have already been found to constitute "crimes of violence" under 18 U.S.C. § 924(c)(3)(A) and, therefore, do not implicate 18 U.S.C. § 924(c)(3)(B), citing *McCoy*. *McCoy*, 995 F.3d at 54–58 (concluding that Hobbs Act robbery, attempted Hobbs Act robbery, and aiding and abetting Hobbs Act robbery and attempted Hobbs Act robbery constitute "crime[s] of violence" under 18 U.S.C. § 924(c)(3)(A)); *accord United States v. Waite*, 12 F.4th 204, 212 (2d Cir. 2021) ("a § 924(c) conviction predicated on aiding and abetting a crime of violence is equivalent to one predicated on the commission of a crime of violence as a principal.")

Finally, with respect to Defendant's contention that Counts 3, 5, 7, and 9, which charge Defendant with "Use of a Firearm During and In Relation to a Crime of Violence," are defective because the offenses alleged in Counts 2, 4, 6, and 8 ("Hobbs Act Robbery" and "Attempted Hobbs Act Robbery") are not violations of the Hobbs Act, the undersigned believes that Defendant's argument is flawed based upon the above discussion. In other words, Counts 2, 4, 6, and 8 are considered "crimes of violence" under the Hobbs Act and thus violative of the Hobbs Act. Accordingly, the undersigned believes that Counts 3, 5, 7, and 9 are not defective because they were properly charged in connection with predicate "crimes of violence."

For the forgoing reasons, the undersigned recommends that the District Court deny that aspect of Defendant's motion seeking to dismiss Counts 3, 5, 7, and 9 of the Indictment.

***Findings of Fact Regarding Defendant's Motion to Dismiss Count 1 Based on Multiplicity.***

Defendant moves to dismiss Count 1 of the Indictment charging Hobbs Act Conspiracy as multiplicitous of Counts 2, 4, 6, and 8. (Pullano Aff. ¶ 130, ECF No. 94.) Counts 2 and 8 charge Defendant with "Hobbs Act Robbery" and Counts 4 and 6 charge Defendant with "Attempted Hobbs Act Robbery." (Indictment at 2–5, ECF No. 68.) Defendant contends that because Count 1 charges a "general conspiracy" and Counts 2, 4, 6, and 8 "have their own conspiracy element directly in the counts of the indictment" Defendant would effectively be charged twice with the same conspiracy. (Pullano Aff. ¶ 130.)

The government counters that Defendant's motion should be denied because Defendant incorrectly states that Counts 2, 4, 6, and 8 have "their own conspiracy element" and because Defendant did not cite to any legal authority to support his position. (Gov't Resp. at 14.)

***Conclusions of Law Regarding Defendant's Motion to Dismiss Count 1 Based on Multiplicity****.*

During oral argument, defense counsel withdrew that portion of Defendant's motion seeking dismissal of Count 1 as multiplicitous of Counts 2, 4, 6, and 8. Defense counsel agreed with the undersigned that Count 1 (Hobbs Act Robbery) requires an agreement between those acting together, but that an agreement is not an element of Counts 4 and 6 (Attempted Hobbs Act Robbery). Further, defense counsel agreed that Count 1 is not multiplicitous of Counts 2 and 8 because a defendant could be acting alone and be charged with Counts 2 and 8, and no conspiracy is required. For

these reasons, the undersigned recommends that the District Court deny this aspect of Defendant's motion.

### Findings of Fact Regarding Defendant's Motion to Dismiss the Indictment Due to Selective/Vindictive Prosecution.

Defendant moves to dismiss the Indictment on the basis of "selective/vindictive prosecution." (Pullano Aff. ¶¶ 123, 234–237.)[7] Defendant contends "upon information and belief" that his co-defendant was provided with the opportunity to cooperate and receive a lower sentence and that he "has been treated far more harshly than his alleged co-conspirator." (*Id.* ¶¶ 123, 234.) Defendant also alleges that for a period of three years prior to his arrest he was pulled over and "subjected to numerous illegal searches of his person, home and cars." (*Id.* ¶ 235.) Finally, Defendant contends that law enforcement caused excessive damage to his residence at 953 Dewey Avenue when executing a search warrant for that location. (*Id.*)

The government asserts that Defendant has failed to demonstrate selective and/or vindictive prosecution. It contends that Defendant was given the opportunity to, and did in fact begin to, cooperate with the government but then decided not to plead guilty and enter a cooperation agreement. (Gov't's Resp. at 46.) The government further argues that Defendant's assertion that he was a target of the police is unsubstantiated and that such conclusory allegations are not sufficient to demonstrate selective prosecution. (*Id.* at 46.) With respect to vindictive prosecution,

---

[7] Defendant's argument seeking to dismiss the Indictment on the grounds of selective/vindictive prosecution begins on page 72 (the page number automatically assigned when the document was electronically filed) with paragraph number "123." (Pullano Aff. at p. 72.) However, the next paragraph after "123" is numbered "234" and the remainder of Defendant's argument on this issue continues with consecutively numbered paragraphs thereafter. (*Id.* at 73.)

the government asserts that Defendant failed to demonstrate that the government is prosecuting him because of a "genuine animus" towards him. (*Id.*)

***Conclusions of Law Regarding Defendant's Motion to Dismiss the Indictment Due to Selective/Vindictive Prosecution.***

The Second Circuit has provided that the standard required for dismissal of an indictment on the basis of selective prosecution is high. *United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one."). To be successful on a claim for selective prosecution, a defendant must establish that he was "treated differently from other similarly situated individuals and that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [Defendant]." *United States v. Stewart*, 590 F.3d 93, 121 (2d Cir. 2009), *cert. denied sub nom.*, *Sattar v. United States*, 559 U.S. 1031 (2010) (internal quotation marks and citations omitted); *accord United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983), *cert. denied sub nom.*, 466 U.S. 971 (1984) (providing that a defendant claiming selective prosecution "bears the burden of establishing *prima facie* both: (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.") (citation omitted).

As with a claim for selective prosecution, there is a high standard required for dismissal of an indictment based on vindictive prosecution. *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013). "[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate." *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir.), *cert. denied sub nom.*, 531 U.S. 1015 (2000) (internal quotation marks and citations omitted). Nonetheless, "a prosecution brought with vindictive motive, 'penalizing those who choose to exercise' constitutional rights, 'would be patently unconstitutional.'" *Id.* (quoting *North Carolina v. Pearce*, 395 U.S. 711, 724 (1969)). A court will dismiss an indictment if actual vindictiveness has been demonstrated, or if, under the circumstances, "'there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action.'" *Id.* (quoting *United States v Johnson*, 171 F.3d 139, 140 (2d Cir. 1999)). To demonstrate an actual vindictive motive, a defendant must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus." *Id.* (citations omitted).

The undersigned does not believe that Defendant has satisfied the high burden of demonstrating selective prosecution because his assertion that his co-defendant was given the opportunity to cooperate appears to be based on nothing more than speculation. Defendant's argument for selective prosecution is based "upon information and belief," but does not state the sources of such information and belief.

Moreover, Defendant does not even address what "impermissible considerations" he contends were directed at him to satisfy his claim for selective prosecution.

In addition, Defendant has not presented any evidence that he has been treated more harshly than his co-defendant. His co-defendant entered into a plea agreement in which he agreed to plead guilty to all 3 Counts against him in the Indictment. (Green Plea Agreement at 1, ECF No. 113.) During oral argument on this omnibus motion, the parties indicated that they had discussed terms of a potential plea for Defendant. (Minute entry for 3/10/22 oral argument, ECF No. 126.) The government specifically stated that if Defendant chose to move forward with arguing the omnibus motion the potential resolution would be withdrawn. Defendant chose to argue his omnibus motion, thereby foreclosing the possibility of a pretrial resolution on the previously offered terms. In other words, the facts establish that Defendant was given the opportunity to take a plea, like his co-defendant, but he chose not to accept it.

Further, Defendant is incorrect in asserting that the criminal activities alleged in the Indictment are the same for both he and his co-defendant. In fact, six out of the nine counts of the Indictment are charged solely against Defendant, including two counts of "Hobbs Act Robbery" (Counts 2 & 8), three Counts of "Use of Firearm During and in Relation to a Crime of Violence" (Counts 3, 7, & 9), and one count of "Attempted Hobbs Act Robbery" (Count 6). (Indictment at 2–6, ECF No. 68.) This also demonstrates that Defendant is not similarly situated to his co-defendant, which Defendant is required to establish to be successful on a claim for selective prosecution.

With respect to vindictive prosecution, while Defendant lists his encounters with law enforcement beginning in February 2017, he has not alleged that the prosecutor harbors any animus towards him or that the prosecutor was acting on behalf of someone else's animus towards Defendant, as is required to be successful on this claim. Nor has he demonstrated a presumption of vindictiveness, providing only speculation in support of his assertions that police "conducted numerous illegal searches of his person, home, and cars." (Pullano Aff. ¶ 235.)

Based upon the forgoing, the undersigned believes that Defendant has failed to satisfy the high burdens for demonstrating selective and/or vindictive prosecution and recommends that the District Court deny this aspect of Defendant's motion.

### Findings of Fact Regarding Suppression of Physical Evidence Seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander.

On March 26, 2020, Monroe County Judge Vincent Dinolfo issued search warrants for 953 Dewey Avenue and the 2019 Mitsubishi Outlander. (Pullano Aff. at Exhibits A & B, ECF No. 94-1.)[8] Defendant seeks to suppress all evidence seized from 953 Dewey Avenue, Rochester, New York, and the 2019 Mitsubishi Outlander. (*Id.* ¶ 156.) In his standing affidavit, Defendant asserts that "[o]n or about March 27, 2020, a search warrant was executed at my home at 953 Dewey Avenue, and my Mitsubishi Outlander NY license plate JJP6649." (Def.'s Suppl. Mot., Ex. H ("Standing Aff.") ¶ 3, ECF No. 120.) He further indicates that he resided at 953 Dewey Avenue, he regularly slept at that residence, he had the right to permit ingress or

---

[8] Judge Dinolfo also issued a search warrant for 50 Almira Street, Rochester, New York on March 26, 2020. (Pullano Aff. at Exhibit D, ECF No. 94-1.) However, Defendant contends that "he has no connection to that location." (*Id.* at 54, ECF No. 94.)

egress of individuals at that residence, and that he had "a reasonable expectation of privacy in the items." (*Id.* ¶¶ 4 & 6.)

Defendant asserts that the "state search warrants were unlawful since they were based upon tainted information unlawfully obtained in the first place." (Pullano Aff. ¶ 160.) In particular, Defendant alleges that the affidavit completed by Investigator Rohr[9] and submitted in support of the application for the warrants for 953 Dewey Avenue and the 2019 Mitsubishi Outlander did not provide Judge Dinolfo with all of the facts before the Judge issued the warrants. (*Id.*) Defendant asserts that Investigator Mackenzie[10] "provided Investigator Rohr with information that a vehicle registered to Robert Forbes was parked in the area on Avenue E . . . [and that] [c]ritically, Investigator Mackenzie in his report states he cannot determine if the vehicle is even occupied." (*Id.*) Defendant contends that since this information was not included in the search warrant application presented to Judge Dinolfo, that the Judge was misled into believing that Defendant "was located close to the robbery at Avenue E and was the person speaking to the co-defendants [sic] who actually entered the location" to conduct a robbery. (*Id.* ¶ 195.)

Defendant also challenges his identification via Ring doorbell camera footage by Investigator Rohr and an ATF confidential informant in connection with a robbery

---

[9] Mark Rohr is an Investigator for the Rochester Police Department "assigned to patrol Section Investigations." (Affidavit of Investigator Mark Rohr, sworn to Mar. 27, 2020 ("Rohr Aff."), ECF No. 94-1.)

[10] Pursuant to Investigator Rohr's affidavit, Andrew Mackenzie is an Investigator with the Rochester Police Department who was conducting surveillance on March 25, 2020, in the area of 200 Avenue E, Rochester, New York when the home invasion occurred at 222 Avenue E, Rochester, New York. (Rohr Aff. ¶ 4.)

at 64 Wellington Avenue, Rochester, New York on March 26, 2020. (*Id.* ¶ 160.)

The government contends that, based on the totality of the circumstances, Investigator Rohr's search warrant application was sufficient to establish probable cause for the issuance of warrants to search 953 Dewey Avenue and the 2019 Mitsubishi Outlander. (Gov't's Resp. at 23.) It also asserts that Defendant's identification by Investigator Rohr and an ATF confidential informant are reliable based upon other information in Investigator Rohr's affidavit. (*Id.* at 28.)

In his affidavit in support of the search warrant application for 953 Dewey Avenue and the 2019 Mitsubishi Outlander, Investigator Rohr indicated that he has served as a police officer and investigator for over twelve years combined. (Rohr Aff. ¶ 4, ECF No. 94-1.) Investigator Rohr further indicated that a home invasion robbery occurred on March 25, 2020, at 222 Avenue E, during which a victim told him that it appeared like the two individuals who unlawfully entered that residence with guns were talking on the phone to a third individual who was telling them where to go in the house. (*Id.*)

In the early hours of March 26, 2020, another home invasion occurred at 64 Wellington Avenue, wherein a male kicked in the door and two other males entered the residence, one holding a handgun. (*Id.* at 12–13.) The individual who kicked in the door did not enter the house. (*Id.* at 12.) Investigator Rohr obtained two clips of Ring doorbell camera footage from the robbery at 64 Wellington. (*Id.* 12–13.) Relevant here, the second video clip "shows the heavier set black male walk up to the rear door and put his hand in front of the Ring Door Bell [sic]. He is wearing a mask over his face, a hooded sweatshirt with thick stripes down the sides of the arms . . . the

heavier set black male kicks in the door and two of the three suspects enter the home
. . . the heavier set male leaves." (*Id.* at 12.) Without providing how, Investigator
Rohr identifies the heavier set male as Defendant. In addition, Investigator Rohr was
able to identify co-defendant Eric Lowe from the Ring doorbell camera footage
because he was familiar with Lowe from other criminal investigations. (*Id.*)

Later, on March 26, 2020, one of the victims of the 64 Wellington robbery whose
iPhone was stolen during that robbery indicated that when she utilized the Find My
iPhone Application, it pinged at 50 Almira Street, the address of co-defendant Eric
Lowe. (*Id.*) Also on March 26, 2020, Investigator Rohr spoke with Investigator
Mackenzie, who was conducting surveillance on Avenue E on a separate case on
March 25, 2022. (*Id.* at 12.) Investigator Mackenzie ran license plate number
JLS5469 in connection with a vehicle parked on Avenue E thirty minutes prior to
when the robbery occurred, which revealed that the vehicle belonged to Defendant
and that he resided at 953 Dewey Avenue. (*Id.*)

At approximately 8:00 p.m. on March 26, 2020, law enforcement conducting
surveillance saw a gray Mitsubishi four door sedan pull up to 50 Almira Street, Apt.
#1—the home of co-defendant Eric Lowe. (*Id.* at 13–14.) The gray Mitsubishi was the
same vehicle Investigator Mackenzie saw on Avenue E prior to the robbery, which he
identified as belonging to Defendant after running the license plate JLS5469. (*Id.* at
13.) The vehicle pulled into Eric Lowe's driveway, picked up a male who looked like
Eric Lowe, left the area, and came back shortly thereafter. (*Id.*) Eric Lowe then exited
the vehicle, went inside, and then came back out to the vehicle. (*Id.*) The vehicle then
proceeded to drive the in the wrong lane without turning on its headlights. (*Id.*) Law

enforcement conducted a traffic stop and found Defendant, Eric Lowe, and one other individual in the vehicle. (*Id.*) In addition, they found zip ties, a black mask, and surgical masks in the gray Mitsubishi. (*Id.*)

On the evening of March 26, 2020, an ATF confidential informant positively identified Defendant as the heavyset individual kicking down the door of 64 Wellington Avenue, as it was captured on Ring doorbell camera footage during the robbery. (*Id.*) That same confidential informant indicated that Defendant "keeps a Kel-Tec handgun with an extended magazine in a black bag" in a 2019 Mitsubishi Outlander, with the license plate number JJP6649, which is registered to Defendant. (*Id.*) In addition, the confidential informant said Defendant had utilized his 2019 Mitsubishi Outlander during several robberies. (*Id.*) Finally, at the time Investigator Rohr wrote his affidavit, Defendant was on parole and his parole-approved address was 953 Dewey Avenue. (*Id.*)

### *Conclusions of Law Regarding Suppression of Physical Evidence Seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander.*

#### a. *Probable Cause.*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Here, the dispute centers not on whether a crime was committed, but whether probable cause

existed to believe that evidence of the crime would be located at 953 Dewey Avenue and in the 2019 Mitsubishi Outlander.

"[P]robable cause to search a place exists if the issuing judge finds a 'fair probability that contraband or evidence of a crime will be found in a particular place' and a federal court must apply a 'totality-of-the-circumstances analysis' in pursuing this inquiry." *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991), *cert. denied*, 503 U.S. 943 (1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When reviewing the validity of a search warrant:

> the duty of [the] court . . . is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing] that probable cause existed.'" *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 2332–39, 76 L.Ed.2d (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 736, 4 L.Ed.2d 697 (1960)). A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and "doubts should be resolved in favor of upholding the warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993), *cert. denied*, 511 U.S. 1042 (1994); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate. . . ."). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of *de novo* review." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 236) (alteration in original). "[R]esolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* (citation omitted); *see United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) ("Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted

pursuant to a warrant, and its related concern that '[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.'" (alteration in original) (citations omitted))

With respect to probable cause, the undersigned believes that the totality of the circumstances, including the detailed information provided in Investigator Rohr's affidavit, afforded Judge Dinolfo a substantial basis for concluding that probable cause existed to issue the warrants for 953 Dewey Avenue and the 2019 Mitsubishi Outlander. Investigator Rohr's affidavit indicates that a vehicle with the license plate JLS5469 was seen on March 25, 2020, in front of 200 Avenue E shortly before the first home invasion at 222 Avenue E. The license plate revealed Defendant as its owner and 953 Dewey Avenue as the residence of Defendant. It also indicates that Ring doorbell camera footage recorded three individuals trying to enter 64 Wellington in the early hours of March 26, 2020, with the "heavy set" individual breaking down the door. Further, an ATF confidential informant positively identified Defendant from the Ring doorbell camera footage. Law enforcement later observed Defendant and his vehicle—the same one seen on Avenue E on the night of the robbery—with co-defendant Eric Lowe, at Lowe's residence at 50 Almira Street and during the traffic stop on March 26, 2020. Further, during that traffic stop of the Defendant's vehicle with license plate JLS5469, law enforcement found zip ties, a black mask, and surgical masks. In addition, one of the victims of the robbery at 64 Wellington Avenue said the Find My iPhone Application pinged at 50 Almira Street on March 26, 2020. Finally, the ATF confidential informant stated that Defendant keeps a handgun in

his 2019 Mitsubishi Outlander and that Defendant has utilized that vehicle for other robberies.

The undersigned does not believe that the lack of detail surrounding Defendant's identification from the Ring doorbell camera footage by Investigator Rohr and the ATF confidential informant are fatal to the probable cause analysis as the other evidence presented in Investigator Rohr's affidavit was sufficient to demonstrate probable cause to support the issuance of the warrants.

Based on the forgoing, the undersigned believes that the totality of the circumstances provided a fair probability that contraband or evidence of a crime would be found in Defendant's 2019 Mitsubishi Outlander and at Defendant's residence of 953 Dewey Avenue. Accordingly, the undersigned believes it was reasonable for Judge Dinolfo, viewing the evidence amassed by Investigator Rohr, to determine he had a substantial basis to conclude that the search warrants were supported by probable cause.

### b. The Good Faith Exception Applies.

Even if the warrant lacked probable cause and Defendant's Fourth Amendment rights were violated when law enforcement searched 953 Dewey Avenue and the 2019 Mitsubishi Outlander, the exclusionary rule does not automatically operate to suppress the seized evidence. "Indeed, exclusion has always been our last resort, not our first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (internal quotation marks and citation omitted). The exclusion of evidence obtained in violation of the Fourth Amendment is a "prudential" remedy, crafted by the Supreme Court to "compel respect for the constitutional guaranty." *Davis v. United*

*States*, 564 U.S. 229, 236 (2011) (internal quotation marks omitted). Neither a "personal constitutional right" nor a means to "redress the injury" of an unconstitutional search, the exclusionary rule is designed to deter future Fourth Amendment violations. *Id.* 236–37 (internal quotation marks and citations omitted). Because the remedy exacts a heavy toll on the justice system, however, the exclusionary rule does not apply whenever suppressing evidence "might provide marginal deterrence." *Herring*, 555 U.S. at 141 (internal quotation marks omitted). The rule's corrective value justifies its cost "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013), quoting *Davis*, 564 U.S. at 238. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence . . . exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (internal quotation marks and citations omitted).

Considering these principles, courts have recognized that evidence obtained by officers "in objectively reasonable reliance" on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009) (citing *United States v. Leon*, 468 U.S. 897, 922 (1989)). When an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, "and thus nothing to deter." *Leon*, 468 U.S. at 920–21. However, the good faith exception cannot shield even an officer who relies on a duly issued warrant in at least four circumstances: "(1) where

the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Clark*, 638 F.3d at 100 (citations omitted). The Supreme Court clarified that these limitations apply not merely in cases of deliberate police misconduct, but also in situations where an officer is "reckless" or "grossly negligent" in seeking or executing a warrant. *Herring*, 555 U.S. at 144.

"The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." *Clark*, 638 F.3d at 100 (internal quotation marks and citations omitted). Moreover, as counseled by the Second Circuit, in assessing whether the government has met its burden, a court must consider that "in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within [the good faith exception's] protection." *Id*.

Here, Defendant contends that the first Leon circumstance applies—namely, that Judge Dinolfo was knowingly misled by Investigator Rohr's affidavit. Defendant argued that Investigator Rohr failed to include in his affidavit that Investigator Mackenzie could not determine if Defendant's car with the license plate JLS5469 was occupied when it was parked on Avenue E approximately a half hour prior to the robbery on that street. Defendant's argument misses the mark. Indeed, the government's contention that the relevance of Investigator Mackenzie's observation and Investigator Rohr's inclusion of that observation in his affidavit is more

plausible—*i.e.*, that a vehicle registered to Defendant was seen in the area near the time of the robbery. (Gov't's Resp. at 28.)

While it is the government's burden to establish the good faith of its officers as provided in *Clark*, 638 F.3d at 100, to even obtain a hearing on whether a law enforcement affidavit contains knowing or reckless falsehoods, a defendant must make "a 'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *Falso*, 544 F.3d at 125 (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). The undersigned believes that Defendant has fallen short of showing that Investigator Rohr made false statements to Judge Dinolfo. Accordingly, the undersigned recommends that the District Court find that the first *Leon* circumstance is not applicable here. In sum, the undersigned recommends that the District Court deny that aspect of Defendant's motion seeking to suppress evidence seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander.

### Findings of Fact Regarding Suppression of Evidence Seized from Defendant and Kia Sportage.

Defendant seeks a hearing related to a traffic stop, which occurred on April 1, 2020, while Defendant was driving his brother's Kia Sportage, and which ultimately led to his arrest. (Pullano Aff. ¶ 177.) Defendant indicates that "[t]he stop occurred when the police obtained information from an unknown source indicating that there was a gun in the car in the area of Norton Street and N. Clinton Ave" and that

"[o]fficers observed Forbes in the area of N. Clinton Avenue and attempted to top [sic] Forbes." (Pullano Aff. ¶ 178.)

In his standing affidavit, Defendant states that "[o]n April 1, 2020, I was driving my brother Darius Taylor's 2019 Kia Sportage, bearing the license plate MRDASH." (*Id.* ¶ 33, ECF No. 120.) Defendant alleges that on that date he "was called to a Family Dollar on N. Clinton Ave" by an acquaintance who asked Defendant for a gun. (*Id.* ¶ 34.) Defendant further alleges that he told the acquaintance that he did not have a gun and left the Family Dollar. (*Id.* ¶¶ 34–35.) Upon leaving, Defendant noticed "a significant line of police cars" following him. (*Id.* ¶ 36.) At one point officers turned on their emergency lights and Defendant alleges that he pulled over, but that once a police vehicle stopped behind him, he "drove off because [he] was scared." (*Id.* ¶ 41.) Defendant alleges that he was "later arrested and did not resist arrest." (*Id.* ¶ 43.)[11] He asserts that he did not provide permission to search either the vehicle or his phone located in the vehicle. (*Id.* ¶ 44.) Finally, Defendant alleges that up until the time the police engaged their emergency lights, he had not committed any traffic infraction or crime. (*Id.* ¶ 45.)

The government contends that Defendant failed to demonstrate standing to challenge the search of the Kia Sportage as he did not provide any evidence that Defendant's brother actually owned that vehicle or that the brother gave Defendant permission to drive it. (Gov't Mem. of Law at 3–4, ECF No. 121.)

---

[11] Defense counsel's affidavit indicates that officers "attempted to top [sic] [Defendant]. He initially pulled over but then led the police on a high-speed chase for approximately 13 minutes. [Defendant] was ultimately stopped by the police and taken into custody." (Pullano Aff. ¶ 178.)

The government further alleges that when the police officers engaged their emergency lights, Defendant sped up and led the officers on a "high-speed pursuit . . . [that] lasted for approximately 13 minutes, during which time the defendant drove on sidewalks and front lawns in residential neighborhoods. The defendant's vehicle was eventually stopped after colliding with a marked RPD patrol car." (Gov't's Resp. at 21, ECF No. 101.) The government provided further details about the incident in a later submission indicating that Defendant drove 100 miles per hour in a 55 mile per hour zone, drove over the sidewalk and across residential front lawns, and went the wrong way down a one-way street. (Gov't's Mem. of Law at 6–7, ECF No. 121.)

The government also argues that Defendant never established any unlawful "seizure" under the Fourth Amendment because he admits that once he pulled over and the police pulled up behind him, he "drove off." The government asserts that Defendant failed to demonstrate "how he submitted to police authority, how his liberty was restrained, or how he was seized in any way" and analogizes this case to *United States v. Baldwin*, 496 F.3d 215 (2d Cir. 2007), *cert. denied*, 552 U.S. 1222 (2008), discussed below. (Gov't's Mem. of Law at 5, ECF No. 121.) The government concludes that Defendant's conduct amounted to evasion of police authority as opposed to a seizure. (*Id.* at 6.)

The government further contends that Defendant's assertion that he did not commit any traffic violations or crimes prior to the time he was taken into custody fails because what is relevant to Defendant's suppression motion is his conduct after the attempted stop—fleeing a traffic stop, committing multiple traffic violations, and crashing into a police vehicle. (*Id.*) The government asserts that Defendant has failed

to challenge the factual allegations supporting probable cause for his arrest and has also failed to articulate any basis to contest his arrest and search of the Kia Sportage. (*Id.* at 7.)

### Conclusions of Law Regarding Suppression of Evidence Seized from Defendant and Kia Sportage.

#### a.  *Standing to Challenge the Search of the Kia Sportage.*

"It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (citing *Alderman v. United States*, 394 U.S. 165, 171–72 (1969) (additional citations omitted)). A defendant may only invoke the protection of the Fourth Amendment where the government has "violated the defendant's own constitutional rights," as opposed to the rights of a third party. *United States v. Payner*, 447 U.S. 727, 731 (1980). This means that, in the context of a vehicle search, a defendant "must show, among other things, a legitimate basis for being in [the vehicle], such as permission from the owner." *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir.1991), *cert. denied*, 503 U.S. 943 (1992) (citation omitted); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (finding defendant could not object to the search of a car where he had demonstrated "neither ownership of the [vehicle], nor license from the owner to possess the [vehicle]."). The burden rests with the defendant to demonstrate that he received such permission from the owner. *Sanchez*, 635 F.2d at 64. "Mere control over a vehicle" is insufficient

to meet this burden. *United States v. Ruggiero*, 824 F. Supp. 379, 392 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (1995).

Here, Defendant states that he "was driving in [his] brother Darius Taylor's 2019 Kia Sportage." (Standing Aff. ¶ 33.) However, Defendant provides no proof that his brother actually owned the Kia Sportage. Even if he had provided such proof, Defendant did not state that he had permission from his brother to drive that vehicle. For these reasons, the undersigned believes that Defendant lacks standing to seek to suppress evidence seized from the Sportage because he had no Fourth Amendment privacy interest in that vehicle. Accordingly, the undersigned recommends that the District Court deny Defendant's motion to suppress in this respect.

### b. *Defendant Was Not Unlawfully Seized.*

Even if the District Court finds that Defendant has demonstrated standing to challenge the search of the Kia Sportage, the undersigned believes that Defendant was not "seized" within the meaning of the Fourth Amendment. At oral argument, Defendant contended that law enforcement had no reason to stop the Kia Sportage in the first instance and that the stop constituted an unlawful seizure.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV. Seizure occurs within the meaning of the Fourth Amendment when "by means of physical force or show of authority," a law enforcement officer "has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, (1968); *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (noting that "a seizure does not occur simply because a police officer approaches an individual and asks a few

questions . . . Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred") (internal quotation marks and citations omitted). The test has an objective component: an individual can be considered seized when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). This, however, is "a *necessary*, but not a *sufficient*, condition for seizure." *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (emphasis in original).

When an individual claims to have been seized by a police officer's "show of authority," a seizure does not occur unless the individual yields to that show of authority. *Hodari D*, 499 U.S. at 626; *Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.").

The submission to authority cannot be temporary; an individual must actually submit to the police authority. *Baldwin*, 496 F.3d at 218 ("to comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority."); *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000), *cert. denied*, 532 U.S. 1014 (2001) (finding no submission to authority "in any realistic sense" when individual paused for a few moments and gave his name to officers before fleeing); *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994) *cert. denied*, 513 U.S. 1171 (1995) (finding no submission to authority where individual hesitated for a moment and made eye contact with officer before fleeing).

To determine whether conduct constitutes actual submission to police authority, courts must examine "'the totality of the circumstances—the whole picture.'" *Baldwin*, 496 F.3d at 219 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In this regard, "it is the nature of the interaction, and not its length, that matters." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 655 (1979)).

The undersigned believes that the government is correct in asserting that the *Baldwin* case is analogous to the present case. In *Baldwin*, after receiving a tip that "two black men, one wearing a white t-shirt, were carrying firearms [and] standing next to a grey or silver Chevrolet Impala with Virginia license plates," police officers responded and saw the silver Chevrolet Impala with Virginia plates pass them. 496 F.3d at 216–17. The officers turned on their siren and emergency lights, followed the Impala, and pulled up behind it after it stopped. *Id.* at 217. Once the officers were walking towards the Impala, the defendant, who ignored several verbal instructions from the officers, sped away. *Id.* During the chase, the defendant violated traffic laws and barely avoided serious accidents, eventually slamming the Impala into an embankment. *Id.* He was apprehended soon after. *Id.* Law enforcement searched the defendant's person and the inside of the Impala, which revealed a large machine pistol, other guns and ammunition, and drugs. *Id.* The defendant moved to suppress evidence seized from his person and the Impala, contending that he was "seized as soon as he pulled to a stop in response to the patrol car's overhead lights and siren." *Id.* at 218. The Second Circuit held that the defendant's "conduct, all circumstances considered, amounted to evasion of police authority, not submission . . . [and since

the defendant's] momentary stop did not constitute submission to police authority, he had not been seized within the meaning of the Fourth Amendment." *Id.* at 219.

The case at bar is very similar. Here, Defendant indicated that he "pulled over [and] [o]nce the police car pulled behind me, I drove off because I was scared and wanted to make it to either my mothers [sic] house on Dewey Avenue or my brother's house on W. Ridge Road for my own safety." (Standing Aff. ¶ 41, ECF No. 120.) Based upon this admission, the undersigned believes that, like the defendant in *Baldwin*, Defendant was never seized under the Fourth Amendment, but that he instead tried to evade law enforcement. Defendant then led the police on a high-speed chase, only ending when Defendant crashed, at which time he was seized within the meaning of the Fourth Amendment. In viewing the totality of the circumstances, the undersigned does not believe that Defendant was unlawfully seized, and recommends that the District Court reject Defendant's argument in this respect.

### c. *Probable Cause Existed to Arrest Defendant.*

The undersigned believes that Defendant has not challenged, or even addressed the factual allegations that provided probable cause for his arrest. The undersigned believes that Defendant's evasion of law enforcement as described above provided ample probable cause to arrest Defendant. *United States v. Kiture*, 776 F. App'x 747, 749 (2d Cir. 2019) (summary order) (finding ample probable cause for the defendant's arrest after the defendant briefly pulled over, then sped off when police approached his vehicle, "engag[ing] the officers in a high-speed chase, run[ning] a red light, and driv[ing] into parked vehicles.")

For these reasons, the undersigned recommends that the District Court deny Defendant's motion to suppress evidence seized from Defendant and the Kia Sportage.

**Defendant's Motions to Suppress Identification Testimony and Defendant's Statements.**

As indicated, *infra*, during the March 11, 2022, oral argument regarding Defendant's omnibus motions, and in the text order of that same date (ECF No. 124), the undersigned provided Defendant with two weeks after the argument—*i.e.*, until March 25, 2022—to: (1) submit any photo array or arrays which he contends are suggestive, along with any memorandum discussing the conclusions he desired the undersigned to draw from them regarding his motion to suppress identification testimony; and (2) submit an affidavit from an individual with personal knowledge relative to the statements made by Defendant which he seeks to suppress, along with a memorandum discussing the conclusions he desired the undersigned to draw from the allegations in the affidavit. (*Id.*) Defendant did not file supplemental papers on these issues until April 21, 2022—twenty-seven days after the Court-ordered deadline. Defendant did not request any extension of time to file the supplemental papers in the interim. For this reason, the undersigned recommends that the District Court deny those aspects of Defendant's motion seeking to suppress identification testimony and any statements made by Defendant. In the event that the District Court does not find it appropriate to dismiss these aspects of Defendant's motion for

failure to comply with the Court-ordered deadline, the undersigned addresses the two issues below.

### *Findings of Fact Regarding Suppression of Defendant's Statements Taken from Defendant During a Custodial Interrogation.*

Defendant seeks to suppress "all oral and written statements taken by law enforcement starting on April 1, 2020." (Pullano Aff. ¶ 211; Def.'s Aff. ¶ 2, ECF No. 128-1.) Defendant further contends that "under the totality of the circumstances test" his statements were made involuntarily. (*Id.* ¶ 218; Def.'s Aff. ¶ 14, ECF No. 128-1.)

Law enforcement took Defendant into custody on April 1, 2020, after leading police on a high-speed chase and crashing the Kia Sportage he was driving into a marked police vehicle. Defendant contends that while law enforcement interviewed him from approximately 10:22 p.m. to 4:20 a.m. in connection with his arrest, he suffered from a serious injury as a result of dog bites on his right leg and was "in a great deal of pain." (Def.'s Aff. ¶¶ 3, 5, & 6.) Defendant states that he was provided Tylenol for the pain when treated at the hospital prior to his interview, but that law enforcement informed the doctor not to provide him with pain medication because they were going to interview him. (*Id.* ¶ 5.) He said he was bleeding through his bandages. (*Id.* ¶ 3.) Defendant indicates that Agent Martineck read him his *Miranda* rights at 12:28 a.m. (*Id.* ¶ 7.) He further indicates that the agents interviewing him acknowledged his pain and that Defendant told them he was in pain, however Agent Martineck stated that "he had to get to the bottom of this" at approximately 12:36 a.m. (*Id.* ¶¶ 8, 11, & 13.)

Defendant contends he was on parole at the time of the interview and was concerned about parole violations. However, at 12:38–12:40 a.m., Agent Martineck and Investigator Rohr informed him that he would not be arrested for violating his parole curfew. (*Id.* ¶ 9.) Defendant further contends that Investigator Rohr told him that "all [Defendant] had to do was cooperate and [he] wouldn't get violated." (*Id.*) In addition, Defendant indicates that Agent Martineck said Defendant was "facing 75 years in prison" (*id.* ¶ 10) and that another agent mentioned another individual who received a life sentence for committing offenses like those charged against Defendant at 12:46 a.m. (*Id.*) Defendant also states that at 2:19 a.m., Investigator Rohr told him about an individual who was involved in 15 robberies and, because he was the first to cooperate, he only received a one-year sentence. (*Id.* ¶ 12.) Defendant said that "another investigator immediately told [Defendant] they couldn't promise [him] anything," but that it "set [Defendant's] expectations of extreme leniency in [his] case, if [he] cooperated." (*Id.*) Defendant states that all the above information induced him to make involuntary statements. (*Id.* ¶ 14.) Finally, Defendant indicates that he had not taken his mental health medication for approximately a month prior to the interview. (*Id.* ¶¶ 3 & 14.)

On or around May 3, 2022, the government provided the undersigned with the video recording of Defendant's post-arrest interview, which took place from April 1, 2020 to April 2, 2020. The undersigned conducted an *in camera* review of law enforcement's interview with Defendant in reaching the conclusions below.

The government submitted that the video recording of Defendant's interview demonstrates that Defendant freely and voluntarily made statements to the police

after receiving his *Miranda* warnings. (Gov't Resp. to Def.'s Second Suppl. Mot. at 2, ECF No. 129.) The government further contends that even if Defendant was in pain when making his post-arrest statements, such statements should not be suppressed because Defendant "was lucid, spoke coherently, and law enforcement was not relentless or abusive in their treatment of him." (*Id.*) Finally, the government asserts that even if Defendant's claims regarding promises of leniency are accurate, communicating the potential benefits of cooperation or leniency are not improper. (*Id.*)

### Conclusions of Law Regarding Suppression of Defendant's Statements Taken from Defendant During a Custodial Interrogation.

"The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his . . . constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007), *cert. denied sub nom.*, 552 U.S. 1144 (2008), citing *Miranda v. Arizona*, 384 U.S. 436, 444–445 (1966). The government bears the burden of demonstrating that the defendant's statements were voluntary. *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). To determine whether a defendant's statements were made voluntarily, courts look to the totality of the circumstances surrounding the statements. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

In *United States v. Siddiqui*, the Second Circuit found that statements made by a hospitalized Defendant were voluntary where Defendant was "lucid and able to engage the agents in coherent conversation despite the pain attendant to her injury."

699 F.3d 690, 707 (2d Cir. 2012), *cert. denied*, 569 U.S. 986 (2013). The Second Circuit provided that "courts tend to view a hospitalized defendant's statements as voluntary where the defendant was lucid and police conduct was not overbearing." *Id.*; *see also Pagan v. Keane*, 984 F.2d 61, 63 (2d Cir. 1993) (finding the defendant's post-*Miranda* statements voluntary where, despite having undergone surgery for significant injuries due to gunshot wounds twenty hours prior, a police officer that conducted the interview described the defendant as "very alert [and] able to answer all our questions with no problem," despite being in a weakened condition, the defendant tried to blame an accomplice demonstrating he understood the nature of the police questioning, and where medical records described him as "awake, alert, and orientated.").

Further, the Second Circuit has provided that

"Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will," *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995), insofar as "they overcome his desire to remain silent," *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002). A court will not, however, readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers. This is particularly so with respect to promises of leniency. *See id.* ("[V]ague promises of leniency for cooperation ... generally will not, without more, warrant a finding of coercion."); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *see also United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.").

*United States v. Haak*, 884 F.3d 400, 410 (2d Cir. 2018).

In reviewing the video, the undersigned observed that Defendant appears to fall asleep at around 12:02 a.m. as snoring can be heard. Snoring can once again be heard at around 3:46 a.m. and 4:08 a.m. after the interview was complete. The

undersigned suggests that this undermines Defendant's contention that he was in such "excruciating pain from [his] injuries" throughout the interview as to render his statements involuntary. (Def.'s Aff. ¶ 14, ECF No. 128-1.)

In addition, Defendant stated that he was not under the influence of any drugs or alcohol at the time of his interview. He also appeared to provide timely, coherent answers to law enforcement's questions throughout the interview. While law enforcement does verbally acknowledge that Defendant appeared to be in pain, it was not in a cruel manner. In fact, at approximately 12:31 a.m., law enforcement asked how Defendant's pain was doing and, further asked whether he would like a chair on which to set his injured leg. When Defendant responded in the affirmative, an officer promptly left the room and returned with a chair. Once the officer brought in the chair, one of the law enforcement officers present helped him to adjust his chair so that he was more comfortable. At approximately 12:42 a.m., one of the officers noticed that Defendant was adjusting his injured leg and he asked whether there was anything else the officers in the room could do to make Defendant more comfortable. There were other instances where law enforcement asked Defendant if he was okay or if he needed anything—for example, helping him to the bathroom at approximately 3:27 a.m., and asking him if he needed anything at 3:29 a.m.

Further, while law enforcement told anecdotal stories of leniency others received, they made it very clear that they could not guarantee any type of sentence to Defendant. In fact, at approximately 3:53 a.m., when Agent Martineck returned to the room in which Defendant was being held, he told Defendant he was definitely going to get some time, and that if he told Defendant otherwise, he would be lying.

Law enforcement made no guarantee regarding the amount of time Defendant might have to serve related to his crimes, only telling him that cooperation typically resulted in the prosecutor providing some leniency.

In viewing the totality of the circumstances and after having conducted an *in camera* review of Defendant's interview, the undersigned believes that Defendant's statements were voluntary and that law enforcement interviewing him was not overbearing. For these reasons, the undersigned recommends that the District Court deny that part of Defendant's motion seeking to suppress statements.

***Findings of Fact Regarding Suppression of Identification Testimony***.

In his omnibus motion, Defendant contended that "defendant was identified in separate photo array identification procedures and by showing Ring video to a CI," and argued that the identification procedures were unduly suggestive. (Pullano Aff. ¶¶ 204, 206.) In a later submission, Defendant also challenged an identification procedure wherein a witness was shown a single photograph of Defendant on an agent's smart phone and challenged not only the procedure but also any subsequent identification. (Affidavit of Peter J. Pullano, Apr. 21, 2022 ("Pullano Suppl. Aff.") ¶ 4, ECF No. 128.) However, during an evidentiary hearing held before the undersigned on May 3, 2022, Defendant clarified that he is not challenging the identification procedures themselves, but rather arguing that the six-person photo array itself was unduly suggestive. In his papers, Defendant did not indicate how the array was unduly suggestive. However, during the evidentiary hearing, defense counsel argued that it was unduly suggestive because:

(1) Defendant is in the central lower photo, which Defendant believes draws attention to him;

(2) the lighting in Defendant's picture is different from that in pictures 2, 4, and 6, which show darker-skinned individuals in darker pictures such that Defendant is highlighted;

(3) while Defendant has a small amount of facial hair, he contends that the individuals in the other pictures had more facial hair; and

(4) every individual pictured aside from Defendant had a mustache.

In response, the government argues that the array was not unduly suggestive because it contained 6 photographs of African American males of a similar age and build, similar hair style and length, and all having some facial hair. (Gov't Resp. re: Photo Array at 3, ECF No. 132.) The government argued that there was nothing suggestive about Defendant's picture falling in the fifth position of the array and that Defendant does not support this contention with any case law. (*Id.* at 3.) The government further contends that the lighting in photographs 1 and 3 is nearly identical to that in Defendant's photograph. (*Id.* at 4.) In addition, the government argues that Defendant's skin tone is also nearly identical to that of the individuals in photographs 1 and 3, and similar to that of the individual in photograph 4. (*Id.*) The government also argues that the facial hair depicted in the other photographs is varying and that the individuals depicted in photographs 1 and 3 have very similar facial hair to that of the Defendant. (*Id.* at 5.) Finally, and contrary to what Defendant has argued, the government asserts that it does appear that Defendant has a mustache "or shading of what appears to be a mustache." (*Id.*)

With respect to the single photograph shown to a witness for identification purposes, in its response to Defendant's supplemental motion to suppress statements and identifications (ECF No. 129), the government indicated that it conveyed to the defense that it does not intend to call the witness who made this identification.

***Conclusions of Law Regarding Suppression of Identification Testimony.***

"When the appearance of participants in a lineup is not uniform with respect to a given characteristic, the principal question in determining suggestiveness is whether the appearance of the accused, *matching descriptions given by the witness*, so stood out from all of the other [s] [sic] . . . as to suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Wong*, 40 F.3d 1347, 1359–60 (2d Cir. 1994), *cert. denied*, 514 U.S. 1113 (1995) (internal quotation marks and citations omitted, emphasis in original). In addition, a photo array is not impermissibly suggestive where it contains six photographs. *United States v. McGee*, No. 99-CR-150E, 2000 WL 1520957, at *3 (W.D.N.Y. Oct. 10, 2000). Further, "[t]here is no requirement that a suspect in a lineup be surrounded by people identical in appearance." *United States v. Brown*, 167 F. Supp. 3d 447, 450 (W.D.N.Y. 2016) (citation omitted).

With respect to Defendant's first argument regarding the location of his picture as number five in the six-person array, the undersigned believes this argument should be rejected. Defendant has not provided any support for why he believes being fifth in the photo array is in any way unduly suggestive and cites to no case law to support this assertion.

Defendant's next argument is that the lighting in pictures 2, 4, and 6 is darker and depicts darker-skinned individuals such that Defendant is highlighted. In reviewing the array, it appears the complexion of the individuals in photographs 1 and 2 are similar to that of Defendant, and it can be argued that the individual depicted in photograph 4 is also similar. Accordingly, there are at least three other photographs that are similar to that of Defendant, which the undersigned believes defeats Defendant's argument that the photo array was unduly suggestive due to the lighting and depiction of two darker-skinned individuals. *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994), *cert. denied*, 513 U.S. 862 (1994) ("While it is true that the photograph of Minier-Contreras is slightly brighter and slightly more close-up than the others, we find that these differences did not render the array suggestive."); *Brown*, 167 F. Supp. 3d at 450 ("The other individuals pictured in the array have complexions similar and different than Defendant's in terms of darkness/lightness, but all appear to have similar racial complexions, and the differences in the shades of some of the complexions of some of the individuals depicted does not render the photo array unduly suggestive.")

Finally, Defendant contends that the other individuals had more facial hair and that he was the only one depicted without a mustache. It appears that the individuals depicted in photographs 1 and 3 have very similar facial hair to that of Defendant. In addition, while Defendant contended that he was the only one pictured that did not have a mustache, it does appear that he has some hair growth above his lip, making it appear as though he does, in fact have a mustache. The undersigned believes that Defendant's challenges to the array in this respect lack merit. Based on

the forgoing, the undersigned recommends that the District Court deny Defendant's motion to suppress the identification testimony.

With respect to the single photograph identification, given the government's representations that it does not intend to call the witness who made the identification, the undersigned recommends that the District Court find this part of Defendant's motion to be moot.

### *Findings of Fact Regarding Probable Cause to Conduct the Traffic Stop of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.*

Defendant alleges that law enforcement illegally stopped his 2019 Mitsubishi Mirage, license plate number JLS5469, on March 26, 2020. (Pullano Aff. ¶ 162, ECF No. 94.) Defendant alleges that law enforcement pulled him over and that he denies committing any traffic violations prior to the stop. (*Id.* ¶ 185.) He seeks to suppress all physical evidence seized during that traffic stop as fruit of the poisonous tree. (*Id.* ¶ 167.) Defendant requested a hearing to determine whether the stop was lawful in the first instance. (*Id.* ¶ 184.)

Approximately five months after Defendant filed his omnibus motion, he filed a standing affidavit in which he provides more detail about the stop. (ECF No. 120.) While he does not outright say that he is the owner of the Mitsubishi Mirage, he refers to the vehicle as "my vehicle" and indicates that when the police pulled him over it was a new car that he had just purchased. (*Id.* ¶¶ 11, 15.)

In addition, Defendant relies upon a Rochester Police Department Investigative Action Report, dated March 25, 2020, in which the investigating officer indicates that "a NYS DMV check revealed that the vehicle was a 2019 Mitsubishi

Mirage registered to a Robert A. Forbes, Jr. . . . and an address of 953 Dewey Ave Rochester NY 14613." (Pullano Aff. ¶ 166 & Exhibit E.) Defendant alleges that he was driving the Mitsubishi Mirage on the date in question and that he did not commit any unlawful traffic offenses or crimes. (Standing Aff. ¶¶ 7, 11.) He said that he saw police following him and they pulled him over. (*Id.* ¶¶ 9, 10, 12.) An officer told him that he had a broken tail light but Defendant knew it was not broken because the car was new. (*Id.* ¶ 15.)

During the May 3, 2022, hearing before the undersigned, the government called Investigator Christopher Marsherall to testify. He testified that he has been a police investigator with the Rochester Police Department ("RPD") for over fifteen years and that he has been in the Special Investigations Section for three years. It is the Court's recollection that Investigator Marsherall was conducting surveillance at 50 Almira Street in Rochester in plainclothes in an unmarked vehicle on March 25, 2020. He had been asked by other members of the RPD to conduct surveillance relevant to home invasions and a gray 2019 Mitsubishi Mirage, license plate number JLS5469. The Court recalls that Investigator Marsherall testified that he saw the Mirage at approximately 8:40 p.m., after dark, traveling southbound on Almira Street and then travel southbound in a northbound lane. In addition, Investigator Marsherall testified that the vehicle's lights were turned off prior to coming to a stop at 50 Almira Street. Based upon Investigator Marsherall's observations, he concluded that the driver of the vehicle violated New York State Vehicle and Traffic Law §§ 1120(a) and 375(2)(a)(1). At some point thereafter, he radioed his observations to other RPD members describing the vehicle and indicating that the vehicle had

violated the Vehicle and Traffic Law such that there was probable cause to stop the vehicle.

### Conclusions of Law Regarding Probable Cause to Conduct the Traffic Stop of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). However, "[t]he Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (emphasis in original). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810.

Here, the government alleges that Defendant violated §§ 1120(a) and 375(2)(a) of New York State's Vehicle and Traffic Law. In relevant part, § 1120(a), titled "Drive on right side of roadways, exceptions," provides "(a) [u]pon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway" and then provides a list of exceptions not applicable here. N.Y. Veh. & Traf. Law § 1120(a).

Further, in relevant part, § 375(2)(a) provides:

2. (a) Every motor vehicle except a motorcycle, driven upon a public highway during the period from one-half hour after sunset to one-half

hour before sunrise or at any other time when windshield wipers are in use, as a result of rain, sleet, snow, hail or other unfavorable atmospheric condition, and at such other times as visibility for a distance of one thousand feet ahead of such motor vehicle is not clear, shall display:

1. at least two lighted head lamps on the front, one on each side, having light sources of equal power.

N.Y. Veh. & Traf. Law § 375(2)(a)(1).

The undersigned believes that Investigator Marsherall's testimony regarding his observations of the Mitsubishi Mirage on the evening of March 26, 2020, including driving on the wrong side of the street and turning off its lights while driving after dark, establish violations of §§ 1129(a) and 375(2)(a) of New York's Vehicle and Traffic Law. The undersigned therefore recommends that the District Court find that the government established that law enforcement had probable cause to stop Defendant's vehicle.

### Findings of Fact Regarding Probable Cause to Conduct a Warrantless Search of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.

Upon pulling over Defendant's Mitsubishi Mirage on March 26, 2020, the officers involved indicated that they smelled marijuana and that marijuana was in plain view in that vehicle. (Gov't Resp. at 35, ECF No. 101.) They seized surgical masks, a black ski mask, zip ties, two cellular phones, and the vehicle itself. (*Id.*)

Defendant indicates that he did not give the police permission to search his vehicle or take his cellular phone out of his car. (Standing Aff. ¶¶ 22, 29, ECF No. 120.)

The government initially argued that Defendant's standing affidavit submitted in connection with Defendant's prior counsel's omnibus motion was insufficient

because Defendant failed to demonstrate standing to seek to suppress any evidence seized from the Mitsubishi Mirage. In addition, the government alleged that the prior standing affidavit did not challenge allegations that there was marijuana in the vehicle at the time of the stop." (Gov't Resp. to Suppl. Standing Aff. at 2, ECF No. 121.) However, Defendant submitted his supplemental standing affidavit (ECF No. 120) in which he appears to indicate that he owns the Mitsubishi Mirage, but he still did not address allegations of the presence of marijuana in the vehicle.

***Conclusions of Law Regarding Probable Cause to Conduct a Warrantless Search of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.***

The "automobile exception"[12] to the Fourth Amendment "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *Dixon*, 2010 WL 3167381, at *3, quoting *United States v. Navas,* 597 F.3d 492, 497 (2d Cir. 2010), *cert. denied*, 562 U.S. 954 (2010); *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2015), *cert. denied* 552 U.S. 1005 (2007) (same); *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004), *cert. denied*, 544 U.S. 990 (2005) (same). "The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States*

---

[12] The government also contends that "the search of the vehicle was justified . . . as an inventory search." (Gov't's Resp. at 21, ECF No. 101.) However, beyond this statement, the government does not assert any factual allegations that would permit this Court to determine that an inventory search actually occurred and, if so, whether such search was "conducted in conformity with standard police procedures aimed at protecting the owner's property." *United States v. Dixon*, No. 09-CR-6046, 2010 WL 3167381, at *3 (W.D.N.Y. May 26, 2010), *report and recommendation adopted*, No. 09-CR-6046L, 2010 WL 3167380 (W.D.N.Y. Aug. 10, 2010). For this reason, the undersigned recommends that the District Court reject the government's argument that the inventory search exception provided law enforcement with the authority to conduct a warrantless search of the Mitsubishi Mirage.

*v. Ross*, 456 U.S. 798, 824 (1982). In addition, Courts in this Circuit have agreed that, under the automobile exception, "a generalized smell of marijuana provides police with the right to search a defendant's vehicle and any containers within the vehicle where marijuana might be stored." *United States v. Spain*, No. 18-cr-569 (CM), 2019 WL 948814, at *3 (S.D.N.Y. Feb. 13, 2019) (internal quotation marks and citations omitted) (collecting cases). Further, the Second Circuit has explained that the smell of marijuana odor can provide an "objective basis for suspecting legal wrongdoing." *United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006), *cert. denied*, 549 U.S. 1008 (2006) (holding that the smell of marijuana provided an "independent basis for continuing to detain" the car and its occupants (citation omitted)).

Here, the undersigned believes that probable cause existed to search the vehicle because when law enforcement approached the Mitsubishi Mirage they "smell[ed] marijuana emanating from the car and observ[ed] marijuana in plain view in the car." *See United States v. Daniels*, No. 21-CR-81 (KAM), 2021 WL 4690837, at *8 (E.D.N.Y. Oct. 7, 2021) ("detectives had reasonable suspicion to approach the Altima . . . during which probable cause developed, which justified the officers' arrest of the occupants and the search of the Altima, when the detectives observed [defendant] with a lit marijuana cigarette, confirmed the marijuana smell was emanating from the Altima, and saw what appeared to be narcotics in the vehicle in plain view, including the marijuana cigarette in the center console and packets of marijuana in the back seat."); *Dixon*, 2010 WL 3167381, at *3 ("The smell of burning marijuana gave the officers probable cause to search any area of the minivan where marijuana could be found.")

For the forgoing reasons, the undersigned recommends that the District Court find that probable cause existed to search the Mitsubishi Mirage pursuant to the automobile exception.

### Findings of Fact Regarding Probable Cause for the Issuance of the April 1, 2020, Warrant for the Search and Seizure of Defendant's Motorola E6 Cellular Phone.

Defendant alleges that after law enforcement stopped and searched the Mitsubishi Mirage on March 26, 2020, they seized a Motorola E6 cell phone that was plugged into the charger of the vehicle at the time of the traffic stop. (Pullano Aff. ¶ 182, ECF No. 94.) Defendant contends that a search warrant obtained on April 1, 2020, for the search and seizure of his Motorola E6 cell phone is invalid and that any evidence resulting from a search of his cellular phone must be suppressed. (*Id.* ¶ 192.) Defendant only asserts standing to challenge the seizure of a Motorola E6 cell phone plugged into the charger, as the other cell phone seized on that date was on the person of his co-defendant, Eric Lowe. (*Id.* ¶¶ 182–183.)

Defendant argues that the information contained in the affidavit of FBI Special Agent Theresa Lloyd submitted in support of the application for the issuance of a search warrant for his cellular phone failed to sufficiently allege probable cause—i.e., it did not provide a nexus between Defendant and the home robberies. (*Id.* ¶ 192.) Defendant claims that the only information mentioned in the affidavit in support of obtaining a warrant to search his cellular phone is found in paragraph 12, which discusses the fact that Officer Mackenzie saw Defendant's vehicle approximately thirty minutes prior to the robbery on Avenue E on March 25, 2020. (*Id.* ¶ 192.) Defendant asserts that this information misled the undersigned as the issuing United

States Magistrate Judge, as Officer Mackenzie did not state whether Defendant was in the vehicle. (*Id*.) Defendant contends that Officer Mackenzie's report insinuates that Defendant either participated in the robbery on Avenue E on March 25, 2020, or that he was talking on the phone to the robbers directing them where to go in the house that they robbed. (*Id*. ¶ 160.)

On April 1, 2020, Special Agent Lloyd made an application to the undersigned for a search warrant related to the Motorola cellular phone. (Affidavit of FBI Special Agent Lloyd at Ex. G, p. 47, dated Apr. 1, 2020 ("Lloyd Aff."), ECF No. 94-1.) Special Agent Lloyd indicated in her affidavit that based on her experience, knowledge, and training (1) individuals who carry out home invasions often utilize cellular phones to plan and coordinate the invasions, (2) they keep stash houses for the proceeds of their illegal activity, (3) they often utilize cellular phones to contact coconspirators to sell the proceeds of their illegal activities, (4) they store names, telephone numbers, and other information in their cellular phones related to their criminal activity, and (5) they often arrange to meet up after the illegal activity to share proceeds, arrange for payments and to discuss any ongoing law enforcement investigation regarding their illegal activities. (*Id*. at ¶ 5.)

Special Agent Lloyd detailed the two home invasions on March 25, 2020, on Avenue E and March 26, 2020, on Wellington Avenue. (*Id*. ¶¶ 8–18.) A witness of the first robbery on Avenue E indicated that the two males who robbed her appeared to be talking on a cell phone to someone who was telling them where to go in the house. (*Id*. ¶ 8.) They both wore black surgical masks. (*Id*.) The witness later identified co-defendant Eric Lowe as one of the individuals who robbed her at gun point. (*Id*. ¶ 11.)

On March 25, 2020, Investigator Mackenzie was conducting surveillance on Avenue E for a different investigation. (*Id.* ¶ 12.) During this surveillance he ran the license plate of a gray Mitsubishi that was parked near his area of surveillance, which revealed that the vehicle belonged to Defendant, who resided at 953 Dewey Avenue. (*Id.*) A Ring doorbell camera captured video of the Wellington Avenue robbery, which depicted three suspects, two of whom were wearing face masks, one of whom was later identified as Eric Lowe. (*Id.* ¶¶ 16–17.) The suspects took a cellular phone from that location and the victim used the Find My iPhone Application later that day, which pinged at 50 Almira Street—the residence of Eric Lowe. (*Id.* ¶¶ 14, 18.)

On March 26, 2020, law enforcement conducting plain clothes surveillance at 50 Almira Street observed Defendant's gray Mitsubishi Mirage pull into the driveway at 50 Almira Street and saw an individual that looked like Eric Lowe get into that vehicle. (*Id.* ¶ 19.) Law enforcement stopped the vehicle after it committed several traffic violations and identified Defendant, Eric Lowe, and one other individual. (*Id.*) A search of the vehicle revealed surgical masks, a black ski mask, and zip ties. (*Id.* ¶ 20) Law enforcement executed a search warrant on 50 Almira Street on March 27, 2020, during which they found stolen items from the Wellington Avenue robbery. (*Id.* ¶ 22.)

***Conclusions of Law Regarding Probable Cause for the Issuance of the April 1, 2020, Warrant for the Search and Seizure of Defendant's Motorola E6 Cellular Phone.***

### a. Probable Cause.

In her affidavit, Special Agent Lloyd established that there was a nexus between the two home invasions and Defendant. Special Agent Lloyd indicates that

she knows from her experience, knowledge, and training that individuals engaged in home robberies often utilize cellular phones to conduct the robberies, arrange for meetings after the robberies, and that the cellular phones often contain the names and contact information for coconspirators. She also indicated that Defendant's gray Mitsubishi Mirage was seen in the vicinity of the Avenue E robbery approximately thirty minutes before that robbery occurred. In addition, a witness of the Avenue E robbery indicated that the two men who robbed the home appeared to be talking to a third individual on a cellular phone. One of the individuals identified in both robberies was co-defendant Eric Lowe, and law enforcement saw Defendant's gray Mirage at Lowe's home at 50 Almira Street in the evening of March 26, 2020. In addition, when law enforcement pulled Defendant's vehicle over, they found Eric Lowe as well as surgical face masks, a black ski mask, and zip ties. As set forth in Special Agent Lloyd's affidavit, there was ample probable cause to believe Defendant was actively involved in robberies and that his Motorola E6 cellular phone would contain evidence relevant to his illegal activities.

### b. The Good Faith Exception Applies.

Even if the warrant lacked probable cause and Defendant's Fourth Amendment rights were violated when law enforcement searched Defendant's Motorola E6 cellular phone, the exclusionary rule does not operate to suppress the seized evidence. Defendant alleges that the issuing United State Magistrate Judge, here, the undersigned, was misled for the same reasons he alleges Judge Dinolfo was misled in issuing the search warrants for Defendant's Outlander and Defendant's residence located at 953 Dewey Avenue. (Pullano Aff. ¶ 195–197.) The undersigned

recommends that the District Court reject this argument for the same reasons explained on pages 31 through 34, *infra*.

For these reasons, the undersigned recommends that the District Court find probable cause for the issuance of the search and seizure warrant for Defendant's Motorola E6 cellular phone and deny Defendant's motion to suppress any evidence seized from a search of the contents of the cellular phone.

### *Findings of Fact Regarding Probable Cause for the Issuance of the April 21, 2020, Warrant to Search Defendant's 2019 Mitsubishi Mirage After it was Impounded.*

Defendant asserts that the federal search warrant obtained on April 21, 2020, to search the Mitsubishi Mirage is also invalid and any evidence seized pursuant to that warrant must be suppressed. (*Id.* ¶ 163.)

On April 21, 2020, Special Agent Sean J. Martineck, ATF, provided the undersigned with a search warrant application for the search of Defendant's 2019 Mitsubishi Mirage, license plate number JLS-5469. (Affidavit of Special Agent Sean Martineck, sworn to Apr. 21, 2020, ("Martineck Aff."), ECF No. 94-1.) The "Schedule of Items to be Seized" included "Firearms and items indicative of firearm ownership possession or control, including but not limited to, ammunition, ammunition magazines, and holsters." (*Id.*) In his affidavit, Special Agent Martineck indicated that he was involved in investigating the home invasions committed by Defendant. (*Id.* ¶ 2.) He further indicated that he sought the warrant for the Mitsubishi Mirage on the basis that there was probable cause to believe it contained firearms or ammunition that would constitute evidence and instrumentalities related to the charges of Hobbs Act robbery/conspiracy and the 924(c) charge. (*Id.*)

Special Agent Martineck details the two robberies in his affidavit, including many of the same details included in Agent Lloyd's affidavit discussed above, such as that the two Avenue E robbers appeared to be talking to another male on a cell phone who was directing them where to go in the home and that Defendant's Mitsubishi Mirage was seen parked on Avenue E by law enforcement just prior to the robbery. (*Id.* ¶¶ 5, 9.) Special Agent Martineck indicated that "two males forced their way into [the] residence with handguns and robbed [the victim]." (*Id.* ¶ 5.) The victim of the Avenue E robbery picked out co-defendant Eric Lowe in a photo array on March 26, 2020. (*Id.* ¶ 8.)

Special Agent Martineck also included the details of the 64 Wellington Avenue robbery, addressing the fact that Ring doorbell camera footage showed three males at the time of the robbery, one of whom kicked down the door. (*Id.* at 13.) He also stated that "[o]ne of the suspects held a knife to the female victim while the other pointed a gun at [another victim]." (*Id.* ¶ 11.) Co-defendant Erie Lowe was again identified as one of the robbers. (*Id.* ¶ 14.) An ATF confidential informant identified Defendant as the individual who kicked down the door as depicted in the Ring doorbell footage. (*Id.* ¶ 16.)

Special Agent Martineck indicated that a victim of the 64 Wellington Avenue home invasion utilized her Find My iPhone Application on March 26, 2020, which pinged at 50 Almira Street—Eric Lowe's residence—and how law enforcement observed Defendant's Mitsubishi Mirage travel to 50 Elmira Street later that day and pick up Eric Lowe. (*Id.* ¶¶ 15, 17.) After committing traffic violations law enforcement pulled the vehicle over, smelled marijuana, found Defendant, co-defendant Eric Lowe,

and Hugh Cox, searched the vehicle, and then towed it to the Rochester Police Department Auto Pound as evidence. (*Id*. ¶¶ 17, 18, 19.)

After Defendant was charged in the present case, the government conducted a federal proffer with a cooperating defendant ("CD") (who was present inside Defendant's vehicle when law enforcement stopped it on March 26, 2020). (*Id*. ¶ 22.) The CD admitted to being present in Defendant's vehicle when it was pulled over, and indicated that the .22 caliber handgun utilized in the home invasions was brought by an individual named Jeff Steadman-Loyd, the third individual who the CD identified as having participated in the robberies. (*Id*. ¶ 23.) The CD indicated that when law enforcement pulled over the Mitsubishi Mirage, he and the other "co-conspirator" were returning the handgun to Steadman-Loyd and that the CD hid the handgun in the Mitsubishi Mirage's center console where the police did not search. (*Id*.)

### Conclusions of Law Regarding Probable Cause for the Issuance of the April 21, 2020, Warrant to Search Defendant's 2019 Mitsubishi Mirage After it was Impounded.

#### a. Probable Cause.

Here, the undersigned believes Special Agent Martineck established that there was ample probable cause supporting the issuance of the search warrant for the Mitsubishi Mirage once it was impounded.[13] Special Agent Martineck indicated that

---

[13] Law enforcement did not need to obtain a warrant to conduct an inventory search of the vehicle once it was impounded. However, as noted in footnote 12, *infra*, the government did not provide any evidence or testimony that any inventory search was conducted in accordance with standardized procedures such that it could provide a basis for conducting a warrantless search of the Mitsubishi Mirage.

he was involved in investigating the home invasions committed by Defendant and his co-conspirators. He explained that Defendant's Mitsubishi Mirage was seen on Avenue E just prior to the robbery on that date, that Defendant was positively identified by a witness from the Wellington Avenue home invasion from Ring camera doorbell footage, and that co-defendant Eric Lowe had also been identified in connection with both robberies. Defendant's vehicle was seen picking Eric Lowe up in the evening of March 26, 2020, and he was in Defendant's vehicle when law enforcement pulled it over shortly thereafter. Importantly, Special Agent Martineck stated that a gun had been utilized in both home invasions and that the CD told law enforcement that he hid that handgun in the center console of Defendant's Mitsubishi Mirage when law enforcement pulled that vehicle over on March 26, 2020. The CD also disclosed that the handgun belonged to the third co-conspirator that was not present in the vehicle (Defendant and Eric Lowe were both present in the vehicle at the time of the stop) and they were in the process of returning it to him when law enforcement stopped Defendant's vehicle. As set forth in Special Agent Martineck's affidavit, the undersigned believes there was ample probable cause to believe that the gun utilized in the home invasions would be found in Defendant's Mitsubishi Mirage. Based upon the forgoing, the undersigned recommends that the District Court find that the issuing United States Magistrate Judge, here, the undersigned, had a substantial basis to conclude that the April 21, 2020, search warrant was supported by probable cause and deny his motion to suppress any evidence resulting from the same.

### b. The Good Faith Exception Applies.

Even if the warrant lacked probable cause and Defendant's Fourth Amendment rights were violated when law enforcement searched Defendant's 2019 Mitsubishi Mirage after it was impounded, the exclusionary rule does not operate to suppress the seized evidence. Defendant alleges that the issuing United State Magistrate Judge, here, the undersigned, was misled for the same reasons he alleges Judge Dinolfo was misled in issuing the search warrants for Defendant's Outlander and his residence located at 953 Dewey Avenue. (Pullano Aff. ¶ 171–174.) Accordingly, the undersigned recommends that the District Court reject this argument for the same reasons explained on pages 31 through 34, *infra*.

Based upon the forgoing, the undersigned recommends that the District Court find that the search warrant for Defendant's Mitsubishi Mirage was supported by probable cause and deny that portion of Defendant's motion seeking to suppress the handgun seized from that vehicle.

## CONCLUSION

Based on the forgoing, the undersigned recommends that the District Court

(1) Deny that aspect of Defendant's motion seeking to dismiss the Indictment on various grounds;

(2) Deny that aspect of Defendant's motion seeking to suppress physical evidence seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander;

(3) Deny that aspect of Defendant's motion seeking to suppress physical evidence seized from Defendant a Kia Sportage;

(4) Deny those aspects of Defendant's motion seeking to suppress any statements made by Defendant;

(5) Deny those aspects of Defendant's motion seeking to suppress identification testimony;

(6) Deny that aspect of Defendant's motion alleging lack of probable cause to conduct the traffic stop of Defendant's 2019 Mitsubishi Mirage on March 26, 2020;

(7) Deny that aspect of Defendant's motion alleging lack of probable cause to conduct a warrantless search of Defendant's 2019 Mitsubishi Mirage on March 26, 2020, and for suppression of evidence seized in connection therewith;

(8) Deny that aspect of Defendant's motion alleging lack of probable cause for the issuance of the April 1, 2020, warrant for the search and seizure of Defendant's Motorola E6 cellular phone and for suppression of any evidence resulting from a search of the contents of that phone;

(9) Deny that aspect of Defendant's motion alleging lack of probable cause for the issuance of the April 21, 2020, warrant to search Defendant's 2019 Mitsubishi Mirage after it was impounded and suppression of evidence resulting from that search; and

(10) Deny each and every other motion not specifically addressed herein.

Pursuant to 28 U.S.C. § 636(b)(1), the undersigned hereby

**ORDERS**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules of Civil Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

DATED:   June 10, 2022
         Rochester, New York

MARK W. PEDERSEN
United States Magistrate Judge